ASSET PURCHASE AGREEMENT

dated as of July 22, 2011,

by and among

JOHN J. AQUINO, ESQ., NOT IN HIS INDIVIDUAL CAPACITY, BUT SOLELY AS THE
CHAPTER 7 TRUSTEE OF PEPTIMMUNE, INC.

as Seller,

PEPTIMMUNE ACQUISITION, LLC

as Buyer

# TABLE OF CONTENTS

Page

1.  Purchase and Sale of the Purchased Assets. ....................................................................1
2.  Closing; Deliveries at Closing. ......................................................................................7
3.  Representations of Seller ................................................................................................7
4.  Representations of Buyer ...............................................................................................9
5.  Conditions Precedent to the Obligations of Buyer .......................................................10
6.  Conditions Precedent to Obligations of Seller .............................................................12
7.  Covenants of the Parties ..............................................................................................12
8.  Conduct of Auction and Closing of Sale. ....................................................................16
9.  Notices .........................................................................................................................18
10. Termination ..................................................................................................................18
11. Certain Definitions .......................................................................................................20
12. Waiver ..........................................................................................................................22
13. Entire Agreement .........................................................................................................22
14. Assignment ..................................................................................................................23
15. Governing Law; Bankruptcy Court Jurisdiction ..........................................................23
16. No Third Party Beneficiaries .......................................................................................23
17. No Liability of Officers and Directors .........................................................................23
18. Survival of Representations and Warranties .................................................................23
19. Counterparts .................................................................................................................23
20. Severability ..................................................................................................................23
21. Headings ......................................................................................................................24

13450364.11

List of Schedules

Schedule 1.1.1      Trademarks
Schedule 1.1.3      Assigned Contracts and Additional Assigned Contracts
Schedule 1.1.4      Patents
Schedule 3.6        Intellectual Property
Schedule 3.8        Inventory
Schedule 3.9.2      Cure Costs
Schedule 11.1.9     DEEP Assets


List of Exhibits
Exhibit 5.2(a)      Bill of Sale
Exhibit 5.2(b)      Assignment and Assumption Agreement
Exhibit 5.2(c)      IPLA Assignment and Assumption Agreement
Exhibit 5.3         Trademark Assignment
Exhibit 5.4         Patent Assignment
Exhibit 11.1.10     Intellectual Property License Agreement

13450364.11

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of July 22, 2011, by and between John J. Aquino, Esq., not in his individual capacity, but solely as Chapter 7 trustee of Peptimmune, Inc. ("Seller"), and Peptimmune Acquisition, LLC, a Delaware limited liability company ("Buyer").

WHEREAS, on March 21, 2011 (the "Petition Date"), Peptimmune, Inc., a Delaware corporation ("Peptimmune"), filed a voluntary petition for relief under Title 11, United States Code in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") commencing Case No. 11-12298-WCH under Chapter 7 of the Bankruptcy Code (the "Bankruptcy Case");

WHEREAS, Buyer desires to purchase from Seller substantially all of the assets of Peptimmune, free and clear of liens, claims, and encumbrances pursuant to Section 363(f) of the Bankruptcy Code as provided in an order of the Bankruptcy Court approving such sale under section 363 of the Bankruptcy Code to be entered in the Bankruptcy Case, and to assume only certain specified liabilities of Peptimmune related thereto, all on the terms and subject to the conditions set forth in this Agreement and in accordance with Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code;

NOW, THEREFORE, in consideration of these premises, the respective covenants of Buyer and Seller set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Purchase and Sale of the Purchased Assets.

1.1.    *Assets Being Sold.*  Seller agrees to sell and assign to Buyer, and Buyer agrees to purchase, at the Closing (as hereinafter defined) and thereafter as provided herein, all of Peptimmune's right, title and interest in, to and under all of the tangible and intangible assets of the Seller relating to Peptimmune (other than Excluded Assets) (collectively, the "Purchased Assets"), in accordance with the Sale Order (as hereinafter defined) and pursuant to Sections 363 and 365 of the Bankruptcy Code, including but not limited to:

1.1.1.    All rights to the name "Peptimmune[1]," and any other registered and unregistered United States and foreign trademarks, service marks, service names, trade names, internet domain names, brand marks, brand, trade dress, package designs, product inserts, labels, slogans, logos and associated artwork, and all related applications or registrations for any of the foregoing, and any extensions, renewals, continuations, or reissues thereof, or amendments or modifications thereto, together with all goodwill associated therewith, used in the sale, promotion, or marketing of Peptimmune's business (collectively, "Trademarks"), including, without limitation, those trademarks

---

[1]    Notwithstanding anything to the contrary contained herein, the Trustee and the bankruptcy estate shall be entitled to continue to use the name "Peptimmune" in connection with the administration of the Bankruptcy Case.

13450364.11

listed on Schedule 1.1.1 hereto, *provided* that the Trademarks will not include the Excluded Trademarks;

1.1.2.    To the extent assignable, all copyrights (including software and software systems) related to Peptimmune and registrations thereof (collectively, "Copyrights");

1.1.3.    All rights of Peptimmune under licenses, contracts, and agreements related to Peptimmune listed on Schedule 1.1.3 hereto (each a "Schedule 1.1.3 Contract" and together, the "Schedule 1.1.3 Contracts") that Buyer shall elect to have Seller assume and assign to Buyer by notice to Seller in writing before the date of the Sale Hearing, it being agreed that Seller will make all necessary motions and take any other appropriate actions in the Bankruptcy Case to cause any such contract or agreement to be assigned to Buyer (such Schedule 1.1.3 Contracts that Buyer elects to assume, the "Additional Assigned Contracts"), *provided* that Buyer may withdraw such notice at any time prior to the date of entry of an order of the Bankruptcy Court authorizing assumption and assignment of such Additional Assigned Contract and upon the occurrence of any such withdrawal, the Schedule 1.1.3 Contract that is the subject thereof shall no longer constitute an Additional Assigned Contract;

1.1.4.    The patents and patent applications (including design patents, industrial designs and utility models) owned or controlled by, or licensed to Peptimmune relating to or that cover, in whole or in part, the manufacture, use, distribution, marketing, promotion, sale, administration or formulation of any product based on the Purchased Assets, as well as any unfiled patent disclosures, and all substitutions, extensions, additions, reissues, reexaminations, renewals, divisions, continuations, continuations-in-part or supplementary protection certificates thereof, and all foreign counterparts of any of the foregoing, including, without limitation, those patents listed on Schedule 1.1.4 (collectively, "Patents"), together in each case with the right to assert priority with respect thereto;

1.1.5.    All Know-How, show-how, technical and non-technical information, trade secrets, formulae, techniques, sketches, drawings, discoveries, materials, models, inventions, improvements, designs, specifications, processes, apparatus, equipment, databases and database systems, research, experimental work, development, pharmacology and clinical data, software programs and applications, software source documents, third-party licenses, confidential and technical information, confidential business information and any related type of proprietary Intellectual Property right other than the Patents;

1.1.6.    The data and other information related to Peptimmune that has been used for the business of Peptimmune, that is owned by or licensed to Peptimmune or otherwise in the possession of, developed by or on behalf of, or otherwise controlled by Peptimmune, that is used in the business of Peptimmune (collectively, the "Technical Information").

13450364.11

1.1.7.    All registrations related to Peptimmune including all filings with any governmental or regulatory authorities (including the United States Food and Drug Administration ("FDA") or a similar agency) for the purpose of obtaining consent to conduct clinical trials for any product or approval from such governmental authority to commence making, using, or selling any product or any line extensions thereof, including, without limitation, Investigational New Drug Applications ("INDs") and non-exclusive rights (other than in respect of the Field of Use as such term is defined in the DEEP License, in which case such rights shall be exclusive) to reference all governmental or regulatory filings and correspondence;

1.1.8.    All uniform resource locators, e-mail and other internet addresses and domain names, rights in website content and applications and registrations thereof ("URLs") related to the business of Peptimmune and any Intellectual Property related thereto;

1.1.9.    Safety information and adverse event reports related to Peptimmune's products;

1.1.10.    Any inventory of Peptimmune (whether supplies, raw materials, work-in-process, or finished goods), together with related promotional materials, product samples, documentation, and all rights to acquire such inventory in the possession or control of third parties, with the exception of inventory related to the DEEP Assets as set forth on Schedule 1.1.10 (collectively, the "Inventory");

1.1.11.    Copies of all other books and records of the Peptimmune relating to the Purchased Assets;

1.1.12.    To the extent assignable, all representations, warranties, guarantees, indemnities, undertakings, covenants not to compete benefitting the Purchased Assets, certificates, covenants, agreements and all security therefore received by the Peptimmune on the purchase, license or other acquisition of any part of the Purchased Assets;

1.1.13.    All computers and other personal property related to Peptimmune; and

1.1.14.    The DEEP License.

Schedule 1.1 sets forth a list of all of the Purchased Assets.

1.2.    *Excluded Assets*. The Purchased Assets shall not include the following (collectively, the "Excluded Assets"):

1.2.1.    All cash, cash equivalents, and securities of Peptimmune, of its wholly owned subsidiary, Déclion Pharmaceuticals, Inc., a Delaware corporation having its principal place of business at 3 Ashland Road, Boxford, Massachusetts 01921, and of Déclion SAS, a French stock corporation and a wholly owned subsidiary of Déclion Pharmaceuticals, Inc., as of the Closing, wherever located, including, without limitation, in accounts, lock boxes, and other similar accounts (whether maintained at a bank, savings and loan, or other financial institution);

13450364.11

1.2.2.    All income tax refunds or other tax refunds;

1.2.3.    All contracts that are not Additional Assigned Contracts pursuant to Section 1.1.3;

1.2.4.    All accounts receivable existing immediately prior to the Closing, intercompany claims, general intangibles not related to the Purchased Assets, prepaid expenses, deposits, and other current assets of Peptimmune;

1.2.5.    All employee benefit plans, programs, or arrangements and all contracts of insurance, collective bargaining agreements and union contracts of Peptimmune;

1.2.6.    All insurance policies and related claims and all proceeds of insurance policies or related claims of Peptimmune;

1.2.7.    The name "Déclion" and any registered and unregistered United States and foreign trademarks, service marks, service names, trade names, internet domain names, brand marks, brand, trade dress, package designs, product inserts, labels, slogans, logos and associated artwork, and all related applications or registrations for any of the foregoing, and any extensions, renewals, continuations, or re-issues thereof, or amendments or modifications thereto, together with all goodwill associated therewith, not used in the sale, promotion, or marketing of Peptimmune's business (collectively, "Excluded Trademarks");

1.2.8.    All claims and causes of action pursuant to sections 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code;

1.2.9.    The DEEP Assets (the parties agree that the inclusion of the DEEP Assets as Excluded Assets shall in no way limit the rights of Buyer pursuant to the DEEP License); and

1.2.10    The Dèclion Shares.

1.3.    *Assumption of Certain Liabilities.*  At the Closing, or on the date of assumption and assignment in the case of Additional Assigned Contracts for which Bankruptcy Court approval has not been obtained prior to the Closing Date, Buyer will assume only the following liabilities of Peptimmune relating to the Purchased Assets (the "Assumed Liabilities"), and Buyer shall not assume any liability or obligation of Peptimmune whatsoever, whether or not any such liability or obligation pertains to the Purchased Assets.

1.3.1.    Buyer shall assume, under section 365(b)(1)(A) of the Bankruptcy Code, all payment or performance obligations and related liabilities under each Additional Assigned Contract that arise after the date of assumption and assignment of such Contract pursuant to the terms of this Agreement; provided that Buyer, in its sole discretion, may as provided herein elect to delete any contract from the designated list of Additional Assigned Contracts to be assigned to Buyer and, in that event, shall not assume any obligations in respect of such contract (any Additional Assigned Contract

- 4 -

that Buyer does not elect to delete from the list of Additional Assigned Contracts in accordance with this Agreement are sometimes referred to herein, collectively, as the "Assumed Contracts").

1.4.    *Excluded Liabilities.*  Peptimmune shall remain liable for any and all liabilities other than the Assumed Liabilities (such liabilities other than Assumed Liabilities, collectively, the "Excluded Liabilities").  Without limiting the foregoing, (i) Peptimmune shall remain liable for all of Peptimmune's liabilities related to any Excluded Assets and (ii) in no event shall Buyer assume any liabilities arising from the ownership, operation or sale of the Purchased Assets prior to Closing (other than in respect of Buyer's obligation to pay Other Cure Amounts).

1.5.    *Purchase Price.*  The consideration to be paid by Buyer for the Purchased Assets (the "Purchase Price") shall be an amount equal to (a) (i) One Hundred Thousand and 00/100 Dollars ($100,000) in Good Funds as a Deposit, (ii) a cash payment of One Million Four Hundred Thousand Dollars ($1,400,000) less the then-outstanding balance owed by the Trustee with respect to the Post-Petition Loan (the "Closing Date Payment") and (b) the assumption of Assumed Liabilities.  In accordance with Section 2.2, at the Closing, the Buyer shall (x) deliver the Assumption and Assignment Agreement (as hereinafter defined) and (y) make the Closing Date Payment by (i) the delivery of an amount equal to the Closing Date Payment by wire transfer of immediately available funds to an account designated in writing by Seller, or in such manner or form as may be mutually satisfactory; and (ii) release of the Deposit by Seller.

1.5.1.    *Deposit.*

1.5.1.1.    Within one Business Day following the date that the Bid Procedures Motion is approved, the Buyer shall make a cash deposit of One Hundred Thousand Dollars ($100,000) (the "Deposit") by wire transfer to Seller to be held in escrow and to be applied to the Closing Date Payment.

1.5.1.2.    The Deposit (but excluding any interest or other income earned thereon) shall be nonrefundable upon the termination of this Agreement by Seller pursuant to Section 10.1.5 or 10.1.8 (any such termination, a "Seller Deposit Event").  The Deposit (together with any interest or other income earned thereon) shall be refunded to Buyer following the termination of this Agreement for any other reason, including under Sections 10.1.1, 10.1.2, 10.1.3, 10.1.4, 10.1.6, 10.1.7 or 10.1.9 (any such termination, a "Buyer Refund Event").  At the Closing, the Deposit (and any interest or income accrued thereon) shall be paid over to Seller and upon such payment, credited and applied toward payment of the Purchase Price.

1.5.1.3.    In the event of a Buyer Refund Event, if within seven Business Days immediately following such Buyer Refund Event, Seller does not deliver to Buyer an objection thereto, Seller shall release the Deposit from escrow to Buyer. In the event Seller deliver a written objection in accordance with the immediately preceding sentence, the parties shall submit such dispute to the Bankruptcy Court. In such event, Seller shall release the Deposit (together with any interest or other income earned thereon) in accordance with an order of the Bankruptcy Court.

- 5 -

1.5.1.4.    In the event of a Seller Deposit Event, if within seven Business Days immediately following such Seller Deposit Event, Buyer does not deliver a written objection thereto to Seller, the Deposit shall be released to Seller from escrow.   In the event Buyer delivers a written objection in accordance with the immediately preceding sentence, the parties shall submit such dispute to the Bankruptcy Court.   In such event, Seller shall release the Deposit (together with any interest or other income earned thereon) in accordance with an order of the Bankruptcy Court.

1.5.1.5.    In the event that the Closing has not occurred on or prior to September 19, 2011 and each of Buyer, on the one hand, and Seller, on the other hand, allege that the other is in material breach of this Agreement, and not otherwise able to terminate this Agreement in accordance with its terms, the parties shall submit such dispute to the Bankruptcy Court.   If the Bankruptcy Court shall determine that both Buyer and Seller are in material breach and not otherwise able to terminate this Agreement as a result of such material breach, then the Deposit (together with any interest or other income earned thereon) shall be refunded to Buyer and Seller shall have no obligation to pay the Break-Up Fee to Buyer.   In such event, Seller shall release the Deposit (together with any interest or other income earned thereon) in accordance with an order of the Bankruptcy Court.

1.5.2.    *Allocation of Purchase Price*.   The Purchase Price will be allocated to the Purchased Assets as reasonably agreed by Buyer and Seller within 30 days immediately following the Closing Date.   Buyer and Seller agree that such allocation shall be binding for tax reporting purposes.   If Buyer and Seller are in good faith unable to reasonably agree on an allocation of the Purchase Price to the Purchased Assets, each of Buyer and Seller may file tax returns based on allocations determined by each to be reasonable and shall notify the other of the allocation that will be reported in its tax reporting 30 days prior to filing of such returns.

1.6.    *Further Assurances*.   Each of Buyer and Seller, before, at, and after the Closing, upon the request from time to time of the other party hereto and without further consideration, will do each and every reasonable act and thing as may be necessary or reasonably desirable to consummate the transactions contemplated hereby and to effect an orderly transfer to Buyer of the Purchased Assets, including, without limitation:  executing, acknowledging, and delivering assurances, assignments, powers of attorney, and other documents and instruments; obtaining the approval of the Bankruptcy Court as promptly as practicable for the consummation of the transactions contemplated hereby; furnishing information and copies of documents, books, and records; filing reports, returns, applications, filings, and other documents and instruments with governmental authorities; in the case of Seller, transferring to Buyer trademark registrations, trademark applications, patents, patent applications and the like held by Peptimmune that relate to the Patents and the Trademarks; turning over to Buyer all mail and communications in Seller's possession or control related to the Purchased Assets; and cooperating with the other party hereto (at such other party's expense) in exercising any right or pursuing any claim, whether by litigation or otherwise, other than rights and claims running against the party from whom or which such cooperation is requested.  If any party shall receive any payment that pursuant to this

13450364.11

Agreement is the property of another party, then the party receiving such payment shall promptly turn such payment over to such other party and until such time shall hold it in trust for such other party.

   2.    <u>Closing; Deliveries at Closing</u>.

   2.1.    *Closing*.  The closing of the transactions (the "<u>Transaction</u>") contemplated hereby (the "<u>Closing</u>") shall be held at the offices of Nixon Peabody LLP, counsel to Buyer, located at 100 Summer Street, Boston, Massachusetts 02110 at 10:00 a.m. on the third Business Day after the date of entry of the Sale Order or such other date or place as may be mutually satisfactory to the parties, subject to satisfaction or waiver of the conditions set forth in Sections 5 and 6 hereof (the date of the Closing being the "<u>Closing Date</u>").

   2.2.    *Deliveries at Closing*.  At the Closing, (i) Buyer shall make the Closing Date Payment and shall execute and deliver to Seller the Assumption and Assignment Agreement; and (ii) Seller shall (a) execute and deliver to Buyer the instruments of conveyance specified in Sections 5.2, 5.3 and 5.4, (b) deliver to Buyer the various certificates, instruments and documents referred to in Section 5, (c) deliver to Buyer, or otherwise put Buyer in possession and control of, all of the Purchased Assets of a tangible nature, (d) deliver to Buyer true and complete files for all Additional Assigned Contracts that constitute Assumed Contracts as of the Closing, including originally signed copies of each such Assumed Contract (to the extent in Seller's possession) and all correspondence, amendments, modifications and waivers with respect thereto, and (e) deliver to Buyer copies of all INDs and the annual reports, supplements and amendments with respect to each of the foregoing.

   3.    <u>Representations of Seller</u>.  Seller represents and warrants to Buyer:

   3.1.    *Due Incorporation, Authorization, and Good Standing*.  This Agreement, together with any other agreements relating to the transactions contemplated hereby, and any instruments of transfer and conveyance (collectively, "<u>Transaction Documents</u>") have been duly executed and delivered by Seller, and each of the other Transaction Documents to which Seller is a party, after requisite Bankruptcy Court approval, shall be duly executed by Seller, and delivered by such party at the Closing. This Agreement is, and each of the other Transaction Documents to which each of Seller is a party will be, subject to the approval of the Bankruptcy Court and upon execution by Seller at the Closing, the legal, valid and binding obligation of Seller, enforceable against Seller, in accordance with its terms, in each case subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general applicability relating to or affecting the rights and remedies or creditors and to general principles of equity, regardless of whether enforcement is sought in proceedings in equity or at law.

   3.2.    *No Approval*.  To the best of Seller's knowledge, subject only to the approval of the Bankruptcy Court and filings to be made with the Bankruptcy Court, on or after the Closing Date in connection with the Closing, no consent, approval, order, or authorization of, or declaration or filing with any Governmental Body or other Person is required of, and has not been obtained or made by, Seller in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated hereby and thereby.

13450364.11

3.3.    *Title to Assets.*  To the best of Seller's knowledge, Peptimmune has good title to all Purchased Assets and, at the Closing, Seller will transfer all of its right, title and interest in and to the Purchased Assets to Buyer free and clear of all liens, claims, and encumbrances ("Liens").  Subject to Bankruptcy Court approval, Seller has the complete and unrestricted power and right to transfer the Purchased Assets to Buyer as contemplated by this Agreement.

3.4.    *Brokers, Finders, Etc.*  Seller has not entered into any brokerage or other agreement that has not been terminated contemplating commissions or other payments payable upon sale of the Purchased Assets and the Seller is solely responsible for the payment of the fees and expenses of any such professionals and brokers.  All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the intervention of any person acting on behalf of Seller in such manner as to give rise to any valid claim against Buyer for any brokerage or finder's commission, fee, or similar compensation.

3.5.    *Trade Names and Trademarks.*  To the best of Seller's knowledge, listed on Schedule 1.1.1 are all Trademarks owned or licensed by Seller related to Peptimmune that are registered or as to which registrations are pending with the U.S. Patent and Trademark Office or any counterpart foreign trademark office.

3.6.    *Intellectual Property.*  To the best of Seller's knowledge, with respect to the Purchased Assets and except as set forth on Schedule 3.6, (i) neither Peptimmune nor Seller has received a written notice or written claim of infringement from any third party; (ii) neither Peptimmune nor Seller has knowledge of, nor has Peptimmune or Seller received written inquiry or written notice from any third party directing Seller to review or consider the applicability of a third parties' intellectual property; (iii) to the best of Seller's knowledge, Peptimmune owns or has acquired the necessary licenses to the patents to conduct its business; and (iv) to the best of Seller's knowledge, no third party, is infringing any Intellectual Property Rights.

3.7.    *Regulatory Compliance.*  To the best of Seller's knowledge, Peptimmune is in compliance with all applicable laws, regulatory or warning letters, notices of adverse findings, and any other letters or notices issued or administered by the FDA or other regulatory authority.  To the best of Seller's knowledge, there are no pending or threatened regulatory actions (other than non-material routine or periodic inspections or reviews) by the FDA or other regulatory authority against Seller.  To the best of Seller's knowledge, neither Peptimmune nor Seller has received written notices from the FDA or other regulatory authority alleging or asserting noncompliance with any applicable law in connection with its business.

3.8.    *Inventory.*  To the best of Seller's knowledge, the Inventory existing as of July 2, 2011 is as set forth on Schedule 3.8 hereto.

3.9.    *Contracts; Default; Cure Costs.*

3.9.1.    Seller has furnished or made available to Buyer a true and complete copy of each of the Schedule 1.1.3 Contracts.

3.9.2.    Schedule 3.9.2 sets forth as of the date hereof a list of estimated Cure Costs for each Schedule 1.1.3 Contract.

3.10.  *Litigation.*  To the best of Seller's knowledge, other than the Bankruptcy Case or as described in Peptimmune's bankruptcy schedules or Statement of Financial Affairs, there are no material judgments, decrees, orders, writs, injunctions, rulings, decisions or awards of any court of competent jurisdiction or Governmental Body to which Peptimmune is a party or is subject with respect to the Purchased Assets.

3.11.  *Disclaimer.*  Buyer acknowledges and agrees that, except as expressly provided herein, the sale of the Purchased Assets shall be "as is and where is" and Seller makes no, and hereby disclaims any, representation or warranty to Buyer with respect to the Purchased Assets or the transactions contemplated hereby, including, without limitation, any warranty of merchantability or fitness for a particular purpose.  Without limiting the generality of the foregoing, except as expressly provided herein, Seller makes no representation or warranty, express or implied, as to the validity or utility of the Purchased Assets, the status of any issued patents or registered trademarks or any applications for patents or trademarks, whether transfer documentation executed by Seller is sufficient to transfer title to the Trademarks or Patents registered in foreign jurisdictions, whether any license agreements or other contracts are assignable, or whether any registrations in connection with clinical trials related to the Purchase Assets are effective.

4.    Representations of Buyer.  Buyer represents and warrants to Seller as follows:

4.1.  *Due Incorporation, Authorization, and Good Standing.*  This Agreement is, and each of the other Transaction Documents to which Buyer is a party, will, upon execution thereof by a duly authorized officer of Buyer respectively at the Closing, be the valid and legally binding obligation of Buyer, enforceable in accordance with its terms, subject to bankruptcy, insolvency, moratorium, reorganization, and similar laws of general applicability affecting the rights and remedies of creditors and to general principles of equity, regardless of whether enforcement is sought in proceedings in equity or at law.

4.2.  *No Approval.*  To Buyer's knowledge, no consent, approval, order, or authorization of, or declaration or filing with, any Governmental Body or other entity is required of, and has not been obtained or made by, Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated hereby and thereby.

4.3.  *Brokers, Finders, etc.*  All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the intervention of any person acting on behalf of Buyer in such manner as to give rise to any valid claim against Seller or Buyer for any brokerage or finder's commission, fee, or similar compensation.

4.4.  *Financial Statements; Solvency; Status of Buyer.*  Immediately after giving effect to the consummation of the transactions contemplated by this Agreement, (a) the fair saleable value (determined on a going concern basis) of the assets of Buyer shall be greater than the total amount of Buyer's liabilities (including all liabilities, whether or not reflected in a balance sheet prepared in accordance with GAAP); and whether direct or indirect, fixed or contingent, secured or unsecured, disputed or undisputed); (b) Buyer shall be able to pay its debts and obligations in

- 9 -

the ordinary course of business as they become due and (c) Buyer shall have adequate capital to carry on its businesses and all businesses in which it is about to engage.

5.    <u>Conditions Precedent to the Obligations of Buyer</u>.  The obligations of Buyer to purchase the Purchased Assets and to consummate the other transactions contemplated hereby and by the other Transaction Documents are subject to the satisfaction on or prior to the Closing Date of each of the following conditions, unless expressly waived by Buyer, in its sole discretion, at the Closing:

5.1.    *Representations and Warranties; Covenants*.  The representations and warranties made by Seller in this Agreement (including the Exhibits and Schedules hereto) shall be true and correct in all material respects as of the Closing Date as if made on and as of the Closing Date (except for those specifically made as of a particular date which shall be true and correct as of such date), except where failure to be true and correct in all respects has not had, and would not be reasonably expected to have, a Material Adverse Effect.

5.2.    *Bill of Sale, Assumption and Assignment Agreement*.  Seller shall have executed and delivered (i) a bill of sale ("<u>Bill of Sale</u>") in the form attached hereto as <u>Exhibit 5.2(a)</u>, (ii) an assumption and assignment agreement ("<u>Assumption and Assignment Agreement</u>") in the form attached hereto as <u>Exhibit 5.2(b)</u> conveying to Buyer all of the Purchased Assets and transferring to Buyer the Assumed Contracts, if any, authorized by the Sale Order to be assumed and assigned to Buyer as of the Closing Date, and (iii) an assignment and assumption of intellectual property license agreement (the "<u>IPLA Assignment and Assumption Agreement</u>") in the form attached hereto as Exhibit 5.2(c).

5.3.    *Trademarks*.  Seller shall have executed and delivered to Buyer an Assignment of Trademarks in the form attached hereto as <u>Exhibit 5.3</u> assigning the Trademarks to Buyer.

5.4.    *Patents*.  Seller shall have executed and delivered to Buyer an Assignment of Patents in the form attached hereto as <u>Exhibit 5.4</u> assigning the Patents to Buyer.

5.5.    *Bidding Procedures Order*.  The Bankruptcy Court shall have held a hearing (the "<u>Bidding Procedures Hearing</u>") and shall have entered an order in the Bankruptcy Case approving procedures for solicitation and consideration by the Bankruptcy Court of bids from third parties for the Purchased Assets (the "<u>Bidding Procedures Order</u>"), which Bidding Procedures Order shall be in form and substance reasonably satisfactory to Seller and Buyer, and in any event shall provide that:

5.5.1.    Upon satisfaction of the conditions set forth in Section 7.10, and in accordance with this Agreement, Seller shall pay to Buyer, without further order of the Bankruptcy Court, the Break-Up Fee.

5.5.2.    the initial bid at the Sale Hearing (as hereinafter defined) must, in Seller's sole discretion, exercised in good faith, be equal to or greater than the consideration provided by Buyer hereunder, with a cash payment at closing that is not less than $1,575,000;

13450364.11

5.5.3.    no subsequent order shall be entered modifying the Bidding Procedures Order without Buyer's written consent;

5.5.4.    in the event of open cry bidding at the Sale Hearing, each subsequent bid must be at least $100,000 greater than the preceding bid; and

5.5.5.    if Buyer elects to participate in bidding at the Sale Hearing, Buyer may credit bid the Break-Up Fee and any amounts outstanding under the Post-Petition Loan towards its bid.

5.6.    *Notice of Sale*.  Seller shall have served a copy of a notice of the sale and assumption and assignment of the Assumed Contracts upon (i) all creditors and all other persons who are parties in interest in the Bankruptcy Case, (ii) all persons with security interests, Liens, or other interests in any of the Purchased Assets, (iii) all parties to the Assumed Contracts, and (iv) all other persons required to receive notice of the sale pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  Seller shall have filed a certificate of such service (the "Certificate of Service") with the Bankruptcy Court in the Bankruptcy Case.

5.7.    *Sale Order*.  The Bankruptcy Case shall not been dismissed.  The Bankruptcy Court shall have entered an order in the Bankruptcy Case in form and substance reasonably satisfactory to Seller and Buyer, and in any event that: (i) approves the sale, transfer, assignment, and assumption, as appropriate, of the Purchased Assets (other than Additional Assigned Contracts to be assumed and assigned after the Closing Date) to Buyer upon the terms and conditions set forth herein, free and clear of any and all Liens of any kind or nature whatsoever; (ii) provides that any and all valid Liens shall attach to the Purchase Price at Closing; and (iii) contains findings that all applicable notice and hearing requirements for the Transaction under the Bankruptcy Code, Bankruptcy Rules, and any local rules of the Bankruptcy Court have been satisfied, the Transaction is in the best interests of Peptimmune's estate and creditors in the Bankruptcy Case, and Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code (the "Sale Order").

5.8.    *Final Orders*.  The Bankruptcy Court shall have entered the Sale Order, and neither the Sale Order nor the Bidding Procedures Order shall have been rescinded, reversed, modified, or stayed, and shall be in full force and effect and the Bidding Procedure Order shall be a final order.

5.9.    *No Order*.  No Governmental Body shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions and which are not satisfied or resolved or preempted by the Sale Order.

5.10.    *Third Party Consents; Amendment or Restatement of Assumed Contracts*.  (a) Solely to the extent that the Sale Order is legally insufficient to transfer the Purchased Assets without consent of third parties, all consents, waivers, or approvals required to be obtained by Seller in order to transfer any Purchased Assets or consummate the transactions contemplated hereby, shall have been obtained and shall be in full force and effect.

- 11 -

(b)    Buyer shall have received any and all amendments or restatements of Assumed Contracts that it deems necessary or desirable, in form and substance acceptable to Buyer.

5.11.    *DEEP License.*  The DEEP License shall have been executed and delivered by all parties thereto, the DEEP License shall be in full force and effect, and the rights of Peptimmune shall not have been amended, waived or modified.

5.12.    *Certified Copies.*  There shall have been delivered to Buyer certified copies of the Sale Order and the Certificate of Service entered or filed in the Bankruptcy Case as well as a certified copy of the docket of the Bankruptcy Case.

5.13.    *Delivery of Final Schedules.*  On or prior to the date that is the earlier of five (5) Business Days after the date hereof or two (2) Business Days prior to the Bidding Procedures Hearing, Seller shall deliver a final copy of all schedules to this Agreement, in form and substance acceptable to Buyer.

6.    <u>Conditions Precedent to Obligations of Seller</u>.  Seller's obligations to sell the Purchased Assets to Buyer and to consummate the other transactions contemplated hereby and by the other Transaction Documents are subject to the satisfaction on or prior to the Closing Date of each of the following conditions, unless expressly waived by Seller at or prior to the Closing:

6.1.    *Representations and Warranties.*  The representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects, in each case as of the Closing Date as if made on and as of the Closing Date (except for those specifically made as of a particular date which shall be true and correct as of such date), except where the failure to be true and correct in all respects would not have a material adverse effect on Buyer's ability to consummate the Transaction.  Seller shall have received a certificate of Buyer to that effect signed by a duly authorized officer thereof and dated as of the Closing Date.

6.2.    *Payment Acknowledgment, Assumption and Assignment Agreement.*  Buyer shall have executed and delivered the Assumption and Assignment Agreement and shall have made the Closing Date Payment.

6.3.    *Bankruptcy Court Approval.*  The Bankruptcy Court shall have entered the Sale Order, and such order shall not have been rescinded, reversed, modified, or stayed, and shall be in full force and effect and shall have be final orders.

7.    <u>Covenants of the Parties</u>.

7.1.    *Asset Preservation.*

7.1.1.    Between the date hereof and the Closing Date, Seller shall use good faith efforts to protect and preserve the value of the Purchased Assets (including following the advice of counsel with respect to the preservation of Intellectual Property Rights); <u>provided</u>, however, the parties acknowledge and agree that Seller has no ability to operate the Peptimmune's former business in the ordinary course due to the fact that Peptimmune is a debtor under Chapter 7 of the U.S. Bankruptcy Code and the business is being liquidated in bankruptcy, and the Trustee is further restricted by (i) the limited cash

flow in the context of a Chapter 7 liquidation and (ii) by the Seller's inability to control the conduct of contractual counterparties and other third parties, and such limitations may limit Seller's ability to operate in the ordinary course.

7.1.2.   Except (i) as expressly contemplated by this Agreement or the Bidding Procedures, (ii) as approved by an order of the Bankruptcy Court, (iii) as required by applicable law, or (iv) with the express written approval of Buyer, Seller shall not knowingly take any of the following actions to the extent such action would interfere with the transactions contemplated herein or adversely affect Buyer's ownership or operation of the Purchased Assets after the Closing:

7.1.2.1.   take any action that is intended to result in any of the representations and warranties set forth in this Agreement being or becoming untrue in any material respect;

7.1.2.2.   sell, lease, transfer or otherwise dispose of any of the Purchased Assets, other than (i) inventory sold in the ordinary course of business consistent with past practice and (ii) the DEEP Assets, subject to the execution and delivery of the DEEP License;

7.1.2.3.   enter into any Contract relating to the Purchased Assets, the effect of which would be to grant to a third party any license to use any Intellectual Property; or

7.1.2.4.   enter into any Contract that contains non-competition restrictions purporting to relate to the Purchased Assets.

7.1.3.   Notwithstanding anything in this Agreement to the contrary, all of the actions described in this Section 7.1 relate solely to the Purchased Assets and Buyer acknowledges that Seller may take any actions, in its sole and absolute discretion, relating solely to the Excluded Assets or Excluded Liabilities.

7.2.   *Access to Premises, Information, and Contracting Parties.*   From and after the date hereof, through the Closing Date, Seller will permit Buyer and its authorized representatives to have reasonable access during normal operating hours to records in possession of Seller that reasonably relate to business of Seller. In addition, prior to the Closing Date, Seller will permit authorized representatives and professionals of Buyer reasonable access upon reasonable notice to all books and records of Seller related to the business of Seller, and Buyer shall (at Buyer's expense) be permitted to make abstracts from, or copies of, all such books and records. To the extent consistent with Section 7.4.1 hereof, Seller shall also use its commercially reasonable efforts to provide Buyer access to the counter-parties to the Schedule 1.1.3 Contracts, customers, suppliers, and manufacturing partners. After the Closing Date, Buyer shall permit Seller access to the financial and other records of Peptimmune that are part of the Purchased Assets as may be reasonably necessary for Seller to administer the bankruptcy estate of Peptimmune and Seller shall provide Buyer access to the financial and other records of Seller that are Excluded Assets as may be reasonably necessary to Buyer's development or commercialization of the Purchased Assets.

7.3.    *Non-Assertion.*  Seller shall not assert against Buyer, or any of its Affiliates or sublicensees, any patents obtained or controlled (in whole or in part) by Seller prior to or after the Closing Date that would prevent Buyer or its Affiliates or sublicensees from using the Purchased Assets in connection with (i) researching, developing, making, having made, distributing, using, selling, offering to sell, having sold, marketing, co-marketing, exporting, promoting and co-promoting the Purchased Assets; or (ii) making or having made any product.

7.4.    *Confidential Information.*

7.4.1.    Each party agrees that it will treat in confidence all documents, materials, and other information obtained (whether obtained before or after the date of this Agreement) regarding the other party during the course of the negotiations of the transactions contemplated hereby and the preparation of this Agreement, the Transaction Documents, and other related documents ("<u>Confidential Information</u>").  Confidential Information shall not be communicated to any third person (other than to each party's respective counsel, accountants, financial advisors, investors and other financing sources and other necessary parties on a "need to know" basis only) except as may be reasonably necessary to pursue the advancement, approval and consummation of the transactions contemplated in this Asset Purchase Agreement.  Buyer shall not communicate with potential bidders for the Purchased Assets, entities that have signed a confidentiality agreement in respect of potential transactions with Seller and licensors and other counterparties to the Seller's material contracts without Seller's prior written consent. No party shall use any Confidential Information in any manner whatsoever except solely for the negotiations of the transactions contemplated hereby and the purposes of this Agreement; provided, however, that (a) the parties may disclose this Agreement and its terms as necessary to file the motion to approve the Sale Order and related motions, to comply with the Bidding Procedures Order, the Sale Order, and related orders, and to market the Purchased Assets to other bidders, and (b) after the Closing, Buyer may use or disclose any Confidential Information included in the Purchased Assets.  In the event that the transactions contemplated hereby are not consummated, each party will return all copies of Confidential Information to the other party.  Notwithstanding the foregoing, the obligation of each party to treat Confidential Information in confidence shall not include any information which (a) is or becomes available to such party from a source other than the other party; (b) is or becomes available to the public other than as a result of disclosure by such party or its agents; (c) upon advice of counsel, is required to be disclosed under applicable law (including, without limitation, the Bankruptcy Code) or judicial process, but only to the extent it must be disclosed; or (d) is reasonably deemed necessary by such party to disclose to obtain any of the consents or approvals contemplated hereby.

7.4.2.    If the transactions contemplated hereby are consummated, (i) all Confidential Information relating solely to the Purchased Assets shall be deemed to be information received in confidence from Buyer, and not to already have been known by Seller, for purposes of this Section 7.4 and shall be held in confidence by Seller after the Closing Date pursuant to the requirements set forth in Section 7.4.1, and (ii) all Confidential Information relating in part to the Purchased Assets shall not be used by

13450364.11

Seller to the detriment of Buyer and shall be maintained in confidence after the Closing Date by Seller in the same manner as Seller treats its other confidential information.

7.5.    *No Public Announcement.*  Neither Seller nor Buyer shall, without the approval of the other (which shall not be unreasonably withheld), make any press release or other public announcement regarding the transactions contemplated by this Agreement, except as and to the extent that any such party is so obligated by applicable law, in which case the other party shall be advised and the parties shall use their commercially reasonable efforts to cause a mutually agreeable release or announcement to be issued; *provided* that the foregoing shall not preclude communications or disclosures necessary to (i) implement the provisions of this Agreement; or (ii) comply with accounting obligations or applicable law (including, without limitation, the Bankruptcy Code, securities laws, or the Bidding Procedures Order) or judicial process.

7.6.    *Product Responsibility.*

7.6.1.    Subject to Section 7.7, from and after the Closing, Buyer shall be responsible for (i) taking all actions, paying all fees, and conducting all communication with the appropriate Governmental Body required by applicable legal requirements in respect of the Purchased Assets, including preparing and filing all reports (including adverse drug experience reports) with the appropriate Governmental Body; (ii) taking all actions and conducting all communication with third parties in respect of the Purchased Assets (whether sold before or after the Closing), including responding to all complaints in respect thereof, including complaints related to tampering or contamination; and (iii) investigating all complaints and adverse drug experiences in respect of the Purchased Assets (whether sold before or after the Closing).

7.6.2.    Subject to Section 7.7, promptly after the Closing, Buyer and Seller shall cooperate to transfer responsibility to Buyer for notifications of adverse drug experiences in respect of its products and other issues.

7.6.3.    From and after the Closing until one hundred eighty (180) days after the Closing Date, Seller shall promptly notify Buyer if Seller receives a complaint or a report of an adverse drug experience in respect of the Purchased Assets.  In addition, Seller shall cooperate with Buyer's reasonable requests and use commercially reasonable efforts at no out of pocket expense to Seller to assist Buyer in connection with the investigation of and response to any complaint or adverse drug experience related to the Purchased Assets.

7.7.    *Limitation on Liability.*  Notwithstanding anything in this Agreement to the contrary (but without limiting Buyer's obligations under Section 7.6), with respect to any product that was sold or manufactured by or on behalf of Seller prior to the Closing, other than the Assumed Liabilities, Buyer shall not assume any liabilities of Seller, accrued, contingent or otherwise, and whether arising in contract, tort or otherwise.

7.8.    *Tax Matters.*  Buyer shall be responsible for any and all excise, sales, value added, use, registration, stamp, franchise, transfer and similar Taxes, levies, charges and fees incurred in connection with the transactions contemplated by this Agreement.  The parties hereto shall

- 15 -

cooperate with each other and with each other's respective representatives, including accounting firms and legal counsel, in connection with the preparation or audit of any Tax Return(s) and any Tax claim or litigation in respect of the Purchased Assets and assumption of the liabilities under this Agreement that include whole or partial taxable periods, activities, operations or events on or prior to the Closing Date, which cooperation shall include, but not be limited to, making available employees, if any, for the purpose of providing testimony and advice, or original documents, or any of the foregoing.

7.9.    *Cure Costs.*  Seller shall be exclusively responsible for the payment of, and shall pay as and when required by the Sale Order, all Cure Costs, and Buyer shall be exclusively and solely responsible for payment of, and shall pay, as and when required by the Sale Order, all Other Cure Amounts.

7.10.    *Break-Up Fee.*  Seller shall pay to Buyer, without further order of the Bankruptcy Court, $75,000 as reimbursement of Buyer's costs and expenses and as a break-up fee (the "Break-Up Fee") in the event that Seller would not have the ability to terminate this Agreement pursuant to Section 10.1.5 or 10.1.8 and the Bankruptcy Court fails to approve a sale to Buyer as provided hereunder and instead (a) the Bankruptcy Court approves a sale of the Purchased Assets to an entity (other than an entity affiliated with Buyer) that has submitted a Counteroffer (as hereinafter defined), and such sale closes, or (b) Seller otherwise determines not to proceed with the Transaction (other than by reason of a termination of this Agreement pursuant to Section 10.1.5 or 10.1.8).  The Break-Up Fee shall also be paid in the event that all conditions precedent set forth in Section 5 have been satisfied or waived, with the exception of the condition precedent set forth in Section 5.11(b), and the Bankruptcy Court approves a sale of the Purchased Assets to the counterparty to any counterparty to an Assumed Contract. Notwithstanding the foregoing, the Break-Up Fee shall not be payable if the Agreement is terminated pursuant to Section 10.1.1.  The Break-Up Fee is intended to compensate Buyer for the time and expense dedicated to this transaction and the value added by Buyer in (i) establishing a bid standard or minimum for other bidders, (ii) placing the Purchased Assets in a sale configuration that attracted other bidders to an auction and (iii) for serving as a catalyst for other potential or actual bidders.  The Break-Up Fee shall constitute an allowed administrative expense claim against Peptimmune's estate under Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

7.11.    *Post-Petition Loan.*  Upon reasonable notice and with reasonable documentation, Buyer shall provide Seller with a loan not to exceed an aggregate of $30,000, as and when needed, through and including the Closing, in the form of post-petition financing for such expenses consented to by Buyer related to the Purchased Assets, such that the Trustee may exercise good faith efforts to preserve the Purchased Assets shall be preserved in good working condition and remain fully operational for the purposes to which Buyer will put such assets.  The Seller shall provide notice of all actions taken with respect to the Post-Petition Loan as requested by Buyer.  The Post-Petition Loan shall be repaid to Buyer upon the earlier to occur of: (A) the closing of the sale of the Purchased Assets to any Person (Buyer or otherwise) or (B) payment of the Break-Up Fee to Buyer.

8.    <u>Conduct of Auction and Closing of Sale.</u>

13450364.11

8.1.    *Auction, Sale Hearing, Competing Bids, Etc.*

8.1.1.    Buyer acknowledges that in connection with the sale of the Purchased Assets, Seller shall have advertised to the public in a commercially reasonable manner as required by the Bankruptcy Code or as shall be directed by the Bankruptcy Court in the Bidding Procedures Order, that the Purchased Assets are for sale and will be sold to the highest or best bidder at an auction to be conducted in the Bankruptcy Case (the "Auction"). Buyer shall be entitled to submit further bids at the Auction, consistent with the terms herein, in the event that a higher or better offer than that reflected herein is received by Seller. In the event that the highest or best offer, as determined by the Bankruptcy Court, is submitted at the Auction by a purchaser other than Buyer, then Seller shall be entitled to close a sale pursuant to such other offer (or, if such other offer does not close, then pursuant to the next highest or best offer) and this Agreement shall be considered null and void; *provided* that the Deposit shall remain in escrow until the earlier of ten (10) Business Days after the Auction and the closing date of a sale to a purchaser other than Buyer, after which it shall be returned to Buyer. Subject to Section 10.1, in the event that a purchaser other than Buyer is determined to have submitted the highest and best offer, and such offer does not timely close, Buyer agrees to purchase the Purchased Assets in accordance with the terms of this Agreement at the last offer submitted by Buyer at the Auction.

8.1.2.    Any counteroffer or bid for any of the Purchased Assets (a "Counteroffer") shall comply with requirements established by Seller, provided that Seller may not revise or waive the requirements specified in Section 5.6.

8.2.    *Seller's Motions in Bankruptcy Court.* Within two Business Days of execution of this Agreement, Seller will move the Bankruptcy Court to: (i) enter the Sale Order and the Bidding Procedures Order, (ii) schedule the Bidding Procedures Hearing on an expedited basis, and (iii) schedule the hearing to approve the sale to the Bidder who submits the highest and best bid at the Auction (the "Sale Hearing") on a date no later than September 7, 2011.

8.3.    *Preparation for Closing.* Each of the parties hereto agrees to use its good faith efforts to bring about the fulfillment of the conditions precedent contained in this Agreement, including without limitation the obtaining of all necessary consents, approvals, and waivers for the consummation of the transactions contemplated by this Agreement.

8.4.    *Defense of Orders.* Buyer, with cooperation of Seller, and at Buyer's sole cost and expense, shall defend the Sale Order in the event that the Closing has occurred as provided hereunder.

8.5.    *Additional Assigned Contracts.* Seller will use their good faith efforts to obtain the entry of an order or orders of the Bankruptcy Court authorizing assumption and assignment of any Additional Assigned Contracts that are not covered by the Sale Order as soon after the Sale Hearing as is practicable and Buyer shall be responsible for all costs associated with curing any and all defaults under such contracts required to be cured as a condition of Buyer's assumption thereof.

9.      <u>Notices</u>.  All notices, demands, consents or other communications which any party may be required or may desire to give under this Agreement shall be in writing and shall be deemed to have been duly given (i) upon receipt if mailed by certified mail, return receipt requested, postage prepaid, (ii) one Business Day after prepaid deposit with a reputable overnight delivery service, or (iii) upon receipt if delivered by telecopy or email, the receipt by sender of confirmation or of recipient's email acknowledgement of receipt being conclusive evidence of such receipt, in any case to the party to whom the same is so given or made at the address of such party as set forth below:

> To Seller:

> > John J. Aquino, Esq.
> > Chapter 7 Trustee for Peptimmune, Inc.
> > Anderson Aquino LLP
> > 240 Lewis Wharf
> > Boston, MA 02110
> > jja@andersonaquino.com

> > with a copy to:

> > > Donald F. Farrell, Jr.
> > > Anderson Aquino LLP
> > > 240 Lewis Wharf
> > > Boston, MA 02110
> > > dff@andersonaquino.com

> To Buyer:

> > Peptimmune Acquisition, LLC
> > c/o Nixon Peabody LLP
> > 100 Summer Street
> > Boston, MA 02110
> > Telecopier:  (617) 947-1974
> > Email:  vmilione@nixonpeabody.com
> > Attn:  Victor G. Milione, Esq.

> > with a copy to:

> > > Nixon Peabody LLP
> > > 100 Summer Street
> > > Boston, MA 02110
> > > Telecopier:  (617) 947-1974
> > > Email:  vmilione@nixonpeabody.com
> > > Attn:  Victor G. Milione, Esq.

10.     Termination.

10.1.   *Termination Events*.  This Agreement may be terminated by Buyer or Seller by giving written notice to the other party as follows:

13450364.11

10.1.1.    by mutual written consent of Seller and Buyer,

10.1.2.    by Buyer at any time after August 10, 2011, if the Bidding Procedures Order is not entered on or before such date;

10.1.3.    by Buyer at any time after September 16, 2011, if the Sale Order has not been entered on or before such date (other than as a result of a material breach of this Agreement by Buyer);

10.1.4.    by Buyer at any time after September 30, 2011, if the Closing has not occurred for any reason (other than due to a material breach by Buyer of its obligations hereunder, but only to the extent that, for any material breach other than payment of the Purchase Price at Closing, Seller provided notice to Buyer of such breach and such breach remained uncured for five Business Days following Buyer's receipt of such notice);

10.1.5.    by Seller at any time after September 30, 2011, if the Closing has not occurred for any reason (other than due to a material breach by Seller of its obligations hereunder, but only to the extent that Buyer provided notice to Seller of such breach and such breach remained uncured for five Business Days following Seller's receipt of such notice);

10.1.6.    by Seller if a higher or better offer (as determined by an order of the Bankruptcy Court) is received for the Purchased Assets or the Bankruptcy Court fails to approve a sale to Buyer;

10.1.7.    by Buyer, if (x) any of the representations and warranties of Seller contained in this Agreement shall fail to be true and correct, or (y) there shall be a breach by Seller of their respective covenants or agreements in this Agreement that in case of either (x) or (y) above (i) would result in the failure of a condition set forth in Section 5.1 and (ii) which is not curable or, if curable, is not cured within the earlier of five (5) Business Days after written notice thereof is delivered by Buyer to Seller or the third Business Day after this date of entry of the Sale Order; provided, that Buyer may not terminate this Agreement pursuant to this Section 10.1.7 if Buyer is in material breach of this Agreement;

10.1.8.    by Seller, if (x) any of the representations and warranties of Buyer contained in this Agreement shall fail to be true and correct, or (y) there shall be a breach by Buyer of its covenants or agreements in this Agreement that in case of either (x) or (y) above (i) would result in the failure of a condition set forth in Section 6.1 and (ii) which is not curable or, if curable, is not cured within the earlier of five (5) Business Days after written notice thereof is delivered by Seller to Buyer or the third Business Day after the date of entry of the Sale Order; provided, that Seller may not terminate this Agreement pursuant to this Section 10.1.8 if Seller is in material breach of this Agreement;

10.1.9.    by Buyer, if, prior to the Closing, the Bankruptcy Case is dismissed.

10.2.   *Effect of Termination.*   Each party's right of termination under Section 10.1 is in addition to any other rights it may have under this Agreement, and the exercise of a right of termination will not be an election of remedies.   Buyer's right to the Break-Up Fee under Section 7.10 and the Post-Petition Loan under Section 7.11 shall remain in effect notwithstanding a termination of this Agreement under Section 10.1.

11.   Certain Definitions.

11.1.   *Definitions.*   As used in this Agreement, the following terms have the following meanings:

11.1.1.   "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such specified Person.

11.1.2.   "Bankruptcy Code" means 11 U.S.C. Section 101 et seq. and any amendments thereof operative at the time of the Bankruptcy Case.

11.1.3.   "Bid Procedures Motion" means that certain motion seeking entry of the Bidding Procedures Order.

11.1.4.   "Business Day" means any day that is not a Saturday, Sunday or other day on which banks located in Boston, Massachusetts are authorized or obligated to close.

11.1.5.   "Claim" means a suit, claim, action, proceeding, inquiry, investigation, litigation, demand, charge, complaint, grievance, arbitration, indictment, or grand jury subpoena.

11.1.6.   "Contract" means any written or oral agreement, arrangement, understanding, lease, license, sublicense, or instrument or other contractual or similar arrangement or commitment to which Seller is a party.

11.1.7.   "Cure Costs" means all cure, compensation and restatement costs required to be paid to the non-debtor party to such contract in connection with the assumption and assignment of each Assumed Contract assumed and assigned to Buyer hereunder pursuant to Section 365 of the Bankruptcy Code.

11.1.8.   "Déclion Shares" mean all shares of Déclion Pharmaceuticals, Inc. and membership interests in Déclion SAS.

11.1.9.   "DEEP Assets" means the assets set forth on Schedule 11.1.9.

11.1.10.   "DEEP License" means that certain Intellectual Property License Agreement by and among Seller, Déclion Pharmaceuticals, Inc. and Déclion SAS, in form and substance acceptable to Buyer and substantially in the form attached as Exhibit 11.1.10, pursuant to which Seller has an assignable license relating to the DEEP Assets.

- 20 -

11.1.11.   "Deposit" has the meaning ascribed in Section 1.5.1.

11.1.12.   "GAAP" means United States generally accepted accounting principles.

11.1.13.   "Good Funds" means immediately available, good funds of the United States of America.

11.1.14.   "Governmental Body" means a domestic or foreign national, federal, state, provincial, or local governmental, regulatory or administrative authority, department, agency, commission, court, tribunal, arbitral body or self-regulated entity having jurisdiction over Peptimmune, the Seller or the Purchased Assets.

11.1.15.   "Intellectual Property" means, whether owned or licensed, whether related to use in the United States or another country, (i) any and all patents (including design patents, industrial designs and utility models) and patent applications (including docketed patent disclosures awaiting filing, reissues, divisions, continuations, continuations-in-part and extensions), patent disclosures awaiting filing determination, inventions and improvements thereto, (ii) trademarks, service marks, certification marks, trade names, brand names, trade dress, logos, business and product names, slogans, and registrations and applications for registration thereof together with all goodwill associated therewith and all uniform resource locators, e-mail and other interne addresses and domain names and applications and registrations therefor (collectively, "URLs") , (iii) copyrights (including software and software systems) and registrations thereof, (iv) databases and database systems; (v) inventions, processes, designs, formulae, trade secrets, Know-How, industrial models, confidential and technical information, manufacturing, engineering and technical drawings, product specifications, domain names, discoveries and confidential business information, (vi) intellectual property rights similar to any of the foregoing, (vii) computer software and web site, (viii) copies and tangible embodiments thereof (in whatever form or medium, including electronic media) and (ix) all contracts or licenses for the use of any of the foregoing, in the case of each of the foregoing together with all goodwill directly or indirectly associated therewith.

11.1.16.   "Intellectual Property Rights" means the Patents, Trademarks, Copyrights, Know-How and Technical Information and other rights as indicated in Section 1.1, and all other Intellectual Property owned, licensed, or otherwise controlled by Seller related to the Purchased Assets, including copies and tangible embodiments thereof, in whatever form or medium, including electronic media.

11.1.17.   "Lien" means any security interest, mortgage, pledge, lien, encumbrance, right, hypothecation, option, charge or claim of any nature whatsoever.

11.1.18.   "Material Adverse Effect" means a material adverse effect on (i) the Purchased Assets, or (ii) the ability of Seller to consummate the transactions contemplated by this Agreement.

11.1.19.   "Other Cure Amounts" means all Cure Costs (whether such costs arise in respect of the period occurring before, on or after the Petition Date) related to the Additional Assigned Contracts that constitute Assumed Contracts.

11.1.20.   "Person" means any individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, joint-stock company, trust, Governmental Body or other entity.

11.1.21.   "Post-Petition Loan" means that certain loan from Buyer to the Seller made pursuant to the Post-Petition Loan Order.

11.1.22.   "Post-Petition Loan Order"   means that certain order of the Bankruptcy Court approving the Post-Petition Loan.

11.1.23.   "Tax" or "Taxes" means all taxes, charges, fees, imposts, levies or other assessments, including all net income, franchise, profits, gross receipts, capital, sales, use, ad valorem, value added, transfer, transfer gains, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real or personal property, and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, together with any interest and any penalties, fines, additions to tax or additional amounts thereon, imposed by any taxing authority (federal, state, local or foreign) and shall include any successor or transferee liability in respect of Taxes.

11.1.24.   "Tax Returns" means all returns, declarations, reports, forms, estimates, information returns and statements required to be filed in respect of any Taxes or to be supplied to a taxing authority in connection with any Taxes.

12.   Waiver.   The rights and remedies of the parties to this Agreement are cumulative and not alternative.  Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement, the Transaction Documents, or the other documents referred to herein will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.   To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement, the Transaction Documents, or the other documents referred to herein can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement, the Transaction Documents, or the other documents referred to herein.

13.   Entire Agreement.   The agreement of the parties that is comprised of this Agreement, the Exhibits and Schedules hereto, and the other documents referred to herein sets forth the entire agreement and understanding between the parties and supersedes any prior written agreement or understanding and any prior or contemporaneous oral agreement or

13450364.11

undertaking relating to the subject matter of this Agreement. This Agreement may not be amended or modified except by a written agreement duly executed by each of the parties hereto.

14.    Assignment. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and permissible assigns of Seller and Buyer, including any successor trustee appointed in the Bankruptcy Case. Prior to the Closing, Buyer may not assign its rights and obligations hereunder, without Seller's written consent, provided that Buyer may assign, without written consent of Seller, all or any portion of its rights and obligations hereunder to an Affiliate.

15.    Governing Law; Bankruptcy Court Jurisdiction. This Agreement and all Claims with respect thereto shall be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and, where state law is implicated, the laws of the Commonwealth of Massachusetts without regard to any conflict of laws rules thereof that might indicate the application of the laws of any other jurisdiction. The parties agree that the Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Agreement, the Bidding Procedures Order, and the Sale Order.

16.    No Third Party Beneficiaries. Nothing in this Agreement is intended or shall be construed to give any person or entity, other than the parties hereto, any legal or equitable right, remedy, or claim under or in respect of this Agreement and the Bidding Procedures Order or any provision contained herein or in any schedule or exhibit attached hereto.

17.    No Liability of Officers and Directors. The parties hereto acknowledge and agree that any individual executing this Agreement or any certificates or other documents contemplated by this Agreement on behalf of Buyer or Seller do so on behalf of such entities and not in their individual capacities. As such, no officer, director, employee, or agent of Buyer or Seller shall have any liability hereunder.

18.    Survival of Representations and Warranties. All representations and warranties contained in Sections 3 and 4 hereof shall expire on the Closing Date.

19.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original for all purposes and all of which together shall constitute one and the same instrument. The exchange of copies of this Agreement or amendments thereto and of executed signature pages by facsimile transmission or by email transmission in portable digital format, or similar format, shall constitute effective execution and delivery of such instrument(s) as to the parties and may be used in lieu of the original Agreement or amendment for all purposes. Signatures of the parties transmitted by facsimile or by email in portable digital format, or similar format, shall be deemed to be their original signatures for all purposes.

20.    Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect, if all of the essential terms and conditions herein for each party remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable,

- 23 -

provided that all of the essential terms and conditions herein for each party remain in full force and *effect*.

21.    <u>Headings</u>.  The headings contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, or describe the scope or intent of this Agreement.

13450364.11

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed by their respective duly authorized officers as of the day and year first written above.

BUYER:

PEPTIMMUNE ACQUISITION, LLC

By:

Its: Authorized Representative

By:

Its: Authorized Representative

SELLER:

John J. Aquino, Esq., not in his individual capacity, but solely as Chapter 7 Trustee of Peptimmune, Inc.

13450364 11

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed by their respective duly authorized officers as of the day and year first written above.

BUYER:

PEPTIMMUNE ACQUISITION, LLC

By: _____
Its: _____

By: _____
Its: _____

SELLER:

_John J. Aquino, as Chapter 7 Trustee_
John J. Aquino, Esq., not in his individual capacity, but solely as
Chapter 7 Trustee of Peptimmune, Inc.

_Peptimmune, Inc; and not individually_

# SCHEDULE 1.1.1

## TO  BE  PROVIDED

# SCHEDULE 1.1.3

## TO  BE  PROVIDED

# SCHEDULE 1.1.4

## TO BE PROVIDED

# SCHEDULE 3.6

## TO  BE  PROVIDED

# SCHEDULE 3.8

## TO  BE  PROVIDED

# SCHEDULE 3.9.2

## TO  BE  PROVIDED

# SCHEDULE 11.1.9

## TO BE PROVIDED

## EXHIBIT 5.2(a)

## <u>BILL OF SALE</u>

Pursuant to that certain Asset Purchase Agreement, dated as of July 22, 2011 (the "**Purchase Agreement**"), by and between Peptimmune Acquisition, LLC, a Delaware limited liability company ("**Buyer**") and John J. Aquino, Esq., not in his individual capacity, but solely as Chapter 7 trustee of Peptimmune, Inc. ("**Seller**"), for good and valuable consideration, the receipt and sufficiency of which each Seller hereby expressly acknowledges, Seller hereby sells, transfers, assigns and delivers to Buyer, its successors and assigns, to have and to hold forever, all of its respective right, title and interest in and to all of the Purchased Assets which are not specifically transferred to Buyer pursuant to another assignment or other instrument being executed and delivered by Buyer and Seller concurrently herewith.

Except for terms specifically defined in this Bill of Sale, all capitalized terms used herein shall have the same meanings as such terms have when utilized in the Purchase Agreement.

Notwithstanding anything to the contrary herein, Seller is executing and delivering this Bill of Sale in accordance with and subject to all of the terms and provisions of the Purchase Agreement, and Buyer accepts this Bill of Sale on such basis. To the extent of any conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

### [SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be executed as of the _____ day of _____, 2011.

**BUYER:**

PEPTIMMUNE ACQUISITION, LLC

By: _____
Its: _____


By: _____
Its: _____


**SELLER:**

_____
John J. Aquino, Esq., not in his individual capacity, but solely as Chapter 7 Trustee of Peptimmune, Inc.

## EXHIBIT 5.2(b)

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**"), dated as of August __, 2011, is made and entered into by and between Peptimmune Acquisition, LLC, a Delaware limited liability company ("**Buyer**") and John J. Aquino, Esq., not in his individual capacity, but solely as Chapter 7 trustee of Peptimune, Inc. ("**Seller**"). Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings set forth in that certain Asset Purchase Agreement, dated as of July 22, 2011 (the "**Purchase Agreement**"), by and among Buyer and Seller.

WHEREAS, concurrently with the execution and delivery of this Agreement, Buyer and Seller are consummating the transaction contemplated by the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

Assignment and Assumption. In accordance with and subject to the terms and conditions of the Purchase Agreement, and except as set specifically set forth herein, Seller hereby assigns, transfers and conveys to Buyer, all of Seller's right, title and interest in and to the Assumed Contracts listed in Exhibit A hereto, and Buyer hereby accepts and agrees to and does hereby assume the Assumed Liabilities.

Limitation. Notwithstanding anything to the contrary contained herein, Buyer does not hereby assume or agree to perform or pay any liabilities or obligations of Seller that are not Assumed Liabilities.

Amendments. This Agreement may only be amended by a writing signed by Buyer and Seller.

Execution in Counterparts. This Agreement may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Agreement bearing their original signature as soon thereafter as possible.

Delivery Pursuant to Purchase Agreement. Notwithstanding anything to the contrary herein, each of Seller and Buyer is executing and delivering this Agreement in accordance with and subject to all of the terms and provisions of the Purchase Agreement. To the extent of any conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

Binding Effect. This Agreement shall be binding upon, and shall inure to the benefit of Buyer and each Seller and their respective successors and assigns.

Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

<u>Headings</u>.    The section and paragraph headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

13450364.11

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the parties hereto as of the date first above written.

**BUYER:**

PEPTIMMUNE ACQUISITION, LLC

By: _____
Its: _____

By: _____
Its: _____

**SELLER:**

_____
John J. Aquino, Esq., not in his individual capacity, but solely as Chapter 7 Trustee of Peptimmune, Inc.

Exhibit A

Assumed Contracts

13450364.11

## EXHIBIT 5.2(c)

## IPLA ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS IPLA ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**"), dated as of August __, 2011, is made and entered into by and between Peptimmune Acquisition, LLC, a Delaware limited liability company ("**Buyer**") and John J. Aquino, Esq., not in his individual capacity, but solely as Chapter 7 trustee of Peptimmune, Inc. ("**Seller**"). Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings set forth in that certain Asset Purchase Agreement, dated as of July 22, 2011 (the "**Purchase Agreement**"), by and among Buyer and Seller.

WHEREAS, concurrently with the execution and delivery of this Agreement, Buyer and Seller are consummating the transaction contemplated by the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

Assignment and Assumption. In accordance with and subject to the terms and conditions of the Purchase Agreement, and except as set specifically set forth herein, Seller hereby assigns, transfers and conveys to Buyer, all of Seller's right, title and interest in and to the DEEP License, and Buyer hereby accepts and agrees to and does hereby assume the Assumed Liabilities.

Amendments. This Agreement may only be amended by a writing signed by Buyer and Seller.

Execution in Counterparts. This Agreement may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Agreement bearing their original signature as soon thereafter as possible.

Delivery Pursuant to Purchase Agreement. Notwithstanding anything to the contrary herein, each of Seller and Buyer is executing and delivering this Agreement in accordance with and subject to all of the terms and provisions of the Purchase Agreement. To the extent of any conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

Binding Effect. This Agreement shall be binding upon, and shall inure to the benefit of Buyer and each Seller and their respective successors and assigns.

Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

Headings. The section and paragraph headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

- 3 -

13450364.11

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the parties hereto as of the date first above written.

**BUYER:**

PEPTIMMUNE ACQUISITION, LLC

By: _____
Its: _____

By: _____
Its: _____

**SELLER:**

_____
John J. Aquino, Esq., not in his individual capacity, but solely as Chapter 7 Trustee of Peptimmune, Inc.

13450364.11

## EXHIBIT 5.3

## TRADEMARK ASSIGNMENT

This TRADEMARK ASSIGNMENT (this "**Assignment**"), dated as of August __, 2011, is made and entered into by and between Peptimmune Acquisition, LLC, a Delaware limited liability company ("**Assignee**") and John J. Aquino, Esq., not in his individual capacity, but solely as Chapter 7 trustee of Peptimmune, Inc. ("**Assignor**"). Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings set forth in that certain Asset Purchase Agreement, dated as of July 22, 2011 (the "**Purchase Agreement**"), by and between Assignee and Assignor.

WHEREAS, concurrently with the execution and delivery of this Assignment, Assignor and Assignee are consummating the transaction contemplated by the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1.  <u>Assignment</u>.  In accordance with and subject to the terms and conditions of the Purchase Agreement, and except as set specifically set forth herein, Assignor hereby assigns, transfers and conveys to Assignee, all of Assignor's respective right, title and interest in and to the trademarks and trademark applications listed in <u>Exhibit A</u> (the **Trademarks**), including without limitation the goodwill of the business appurtenant thereto and which is symbolized thereby, and the right to renew any registration therefor, to be held and enjoyed by Assignee for its own use and benefit and for the use and benefit of its successors, assigns and legal representatives, to be used as fully and entirely as said rights would have been held and enjoyed by Assignor had this assignment and sale not been made, together with all claims for damage by reason of past, present or future infringement of said Trademark with the right to sue and collect the same for its own use or for the use of its successors, assigns or other legal representatives, including any trademarks and trademark applications claiming priority to and/or benefit of the Trademarks including those filed in any foreign country/countries. Assignor hereby authorizes and requests the United States Commissioner of Patents and Trademarks, and any officials of foreign countries whose duty is to issue trademarks on applications as aforesaid, to issue all Trademarks in the name of Assignee in accordance with the terms of this Assignment.

2.  <u>Limitation</u>.  Notwithstanding anything to the contrary contained herein, Assignee does not hereby assume or agree to perform or pay any liabilities or obligations of Assignor that are not Assumed Liabilities.

3.  <u>Amendments</u>.  This Agreement may only be amended by a writing signed by Assignor and Assignee.

4.  <u>Execution in Counterparts</u>.  This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature as soon thereafter as possible.

5.      <u>Delivery Pursuant to Purchase Agreement</u>.   Notwithstanding anything to the contrary herein, Assignor and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement.  To the extent of any conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

6.      <u>Binding Effect</u>.  This Assignment shall be binding upon, and shall inure to the benefit of, Assignor and Assignee and their respective successors and assigns.

7.      <u>Governing Law</u>.   This Assignment shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

8.      <u>Headings</u>.  The section and paragraph headings contained in this Assignment are for reference purposes only and shall not in any way affect the meaning or interpretation of this Assignment.

**[SIGNATURE PAGE FOLLOWS]**

13450364.11

**IN WITNESS WHEREOF**, this Assignment has been duly executed and delivered by the parties hereto as of the date first above written.

<u>**ASSIGNOR:**</u>

_____

John J. Aquino, Esq., not in his individual capacity, but solely as Chapter 7 Trustee of Peptimmune, Inc.

<u>**ASSIGNEE:**</u>

PEPTIMMUNE ACQUISITION, LLC

By: _____

Its: _____

By: _____

Its: _____

Exhibit A

## **U.S. Trademarks**

## **Foreign Trademarks**

**EXHIBIT 5.4**

**PATENT ASSIGNMENT**

This PATENT ASSIGNMENT (this "**Assignment**") , dated as of August __, 2011, is made and entered into by and between Peptimmune Acquisition, LLC, a Delaware limited liability company ("**Assignee**") and John J. Aquino, Esq., not in his individual capacity, but solely as Chapter 7 trustee of Peptimmune, Inc. ("**Assignor**"). Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings set forth in that certain Asset Purchase Agreement, dated as of July 22, 2011 (the "**Purchase Agreement**"), by and between Assignee and Assignor.

WHEREAS, concurrently with the execution and delivery of this Assignment, Assignor and Assignee are consummating the transaction contemplated by the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1.    Assignment.  In accordance with and subject to the terms and conditions of the Purchase Agreement, and except as set specifically set forth herein, Assignor hereby assigns, transfers and conveys to Assignee, all of Assignor's respective right, title and interest in and to, including the right to sue for any and all past infringements of, the patents and patent applications listed in Exhibit A (the "**Patents**"), including all patents and patent applications claiming priority to and/or benefit of the Patents including divisions, continuations, and continuations-in-part thereof and all reissues, reexaminations, and extensions thereof, and all priority rights under the International Convention for the Protection of Industrial Property for every member country, and all applications for patents (including related rights such as utility-model registrations, registrations, inventor's certificates, and the like) heretofore or hereafter filed in any foreign country/countries, and all patents (including all extensions, renewals and reissues thereof) granted for in any foreign country/countries. Assignor hereby authorizes and requests the United States Commissioner of Patents and Trademarks, and any officials of foreign countries whose duty is to issue patents on applications as aforesaid, to issue all Patents in the name of Assignee in accordance with the terms of this Assignment.

2.    Limitation.  Notwithstanding anything to the contrary contained herein, Assignee does not hereby assume or agree to perform or pay any liabilities or obligations of Assignor that are not Assumed Liabilities.

3.    Amendments.  This Assignment may only be amended by a writing signed by Assignor and Assignee.

4.    Execution in Counterparts.  This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing its original signature as soon thereafter as possible.

5.    Delivery Pursuant to Purchase Agreement.  Notwithstanding anything to the contrary herein, each of Assignor and Assignee is executing and delivering this Assignment in

13450364.11

accordance with and subject to all of the terms and provisions of the Purchase Agreement. To the extent of any conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

6.      Binding Effect.  This Assignment shall be binding upon, and shall inure to the benefit of, Assignor and Assignee and their respective successors and assigns.

7.      Governing Law.  This Assignment shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts

8.      Headings.  The section and paragraph headings contained in this Assignment are for reference purposes only and shall not in any way affect the meaning or interpretation of this Assignment.

**[SIGNATURE PAGE FOLLOWS]**

13450364.11

**IN WITNESS WHEREOF**, this Assignment has been duly executed and delivered by the parties hereto as of the date first above written.

**ASSIGNOR:**

_____

John J. Aquino, Esq., not in his individual capacity, but solely as Chapter 7 Trustee of Peptimmune, Inc.

**ASSIGNEE:**

PEPTIMMUNE ACQUISITION, LLC

By: _____
Its: _____

By: _____
Its: _____

Exhibit A

**Patents**

| Country | Application No./ Application | Title | Patent/Pub. No. Grant/Pub. Date | Status |
|---------|------------------------------|-------|----------------------------------|--------|

## EXHIBIT 11.1.10

## INTELLECTUAL PROPERTY LICENSE AGREEMENT

THIS INTELLECTUAL PROPERTY LICENSE AGREEMENT (this "Agreement") is entered into as of the ___ day of August, 2011 (the "Effective Date") between John J. Aquino, Esq., not individually but as Chapter 7 Trustee of Peptimmune, Inc., having a principal place of business at Anderson Aquino LLP, 240 Lewis Wharf, Boston, MA 02110 ("Licensee"), and Déclion Pharmaceuticals, Inc., a Delaware corporation having its principal place of business at 3 Ashland Road, Boxford, Massachusetts 01921 ("Déclion") and Déclion SAS, a French stock corporation and a wholly owned subsidiary of Déclion (together with Déclion and any respective Affiliate, collectively, "Licensor").

1.     **Background of Agreement**.

1.1     Whereas, Licensor is the owner and has exclusive rights to certain patents and patent applications claiming the "DEEP Assets" as more fully described in Schedule A hereto (the patents).

1.2     On March 21, 2011 (the "Petition Date"), Peptimmune, Inc. filed a voluntary petition under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Case").   Thereafter, on March 21, 2011, the United States Trustee appointed John J. Aquino of Anderson Aquino LLP, 240 Lewis Wharf, Boston, Massachusetts, as Chapter 7 Trustee.  Licensor is a wholly owned, direct or indirect subsidiary of Peptimmune and currently owns and has exclusive rights to the DEEP Assets.   The Trustee wishes to acquire the rights to use and exploit such IP Rights (as hereinafter defined) as Licensee.

1.3     Licensor is willing to provide Licensee with such rights.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

2.     **Definitions**.   As used herein, the following terms shall have the meanings set forth below:

2.1     "Affiliate" means any corporation, firm, partnership or other entity that controls, is controlled by, or is under common control with the party in question.  "Control" shall mean the ownership, whether direct or indirect, of twenty-five percent (25%) or more of the equity having the power to vote on or otherwise direct the affairs of the entity.

2.2     "Effective Date" has the meaning set forth in the preamble to this Agreement.

2.3     "DEEP Assets" means the assets described on Schedule A hereto.

2.4     "Derivative Works" means any modification or improvement of the IP Rights.

2.5    "Field of Use" shall mean the prevention, treatment or cure of individuals afflicted with multiple sclerosis.

2.6    "IP Rights" shall mean any and all intellectual property rights, including copyrights, U.S. and international patents and patent applications, patents to be issued pursuant thereto, trademarks, trade secrets, unpublished research and development information, unpatented inventions, know-how, technical data and other proprietary rights and all divisions, continuations, continuations in part, reissues, reexaminations, substitutes and extensions thereof in the possession of Licensor at the Effective Date of this Agreement relating to the DEEP Assets and shall include but not be limited to all rights included in the definition of "intellectual property" United States Bankruptcy Code (11 U.S.C. Section 101, et seq.).

3.    **License**. (a)  Licensor hereby grants to Licensee an exclusive, perpetual, irrevocable, worldwide, fully paid, transferable license, (with a right to license and sublicense to third parties and grant a right to further sublicense to said third parties), to: (i) access, use, install, display, modify or exploit the IP Rights for any and all purposes that Licensee may deem desirable within the Field of Use, (ii) access, use, install, display, modify or exploit any Derivative Work (in any form) made or caused to be made by Licensor, for any and all purposes that Licensee may deem desirable within the Field of Use, and (iii) make or have made within the Field of Use a Derivative Work, and to market, sell or otherwise distribute such Derivative Work.

(b)    No further royalties or milestone payments are due to Licensor from Licensee.

4.    **Warranties.**  Licensor hereby warrants and represents to Licensee that Licensor is the owner of all right, title and interest in and to the DEEP Assets, and, to the best of Licensor's knowledge, has the right to grant to Licensee the license set forth in this Agreement without violating any rights of any third party.  Licensor further warrants and represents that, to the best of Licensor's knowledge, the DEEP Assets do not infringe any patent, trademark, trade secret or copyright of any third party, and the DEEP Assets are not subject to any infringement or adverse claim of any third party.

5.    **Litigation; Indemnification**.

5.1    Licensee shall notify Licensor of any suspected infringement of any of the IP Rights. Licensor shall have the right, but not the obligation, to institute a suit against any infringer of any of the Patents.  Licensee agrees to cooperate with Licensor in all respects with regard to any such suit, to have any of Licensee's employees testify when requested by Licensor, and to make available any records, papers, information, specimens, and the like.  Except as provided in Section 5.2, any recovery received pursuant to such suit shall be retained by Licensor.

5.2    In the event that (i) Licensee requests in writing that suit be brought by Licensor under any of the Patents against an infringer of any of the IP Rights, and (ii) Licensor fails to bring such suit against such infringer within ninety (90) days after receipt of Licensee's request, then, in such case, Licensee shall have the right to file suit against such infringer, in the name of Licensor and at Licensee's expense and for Licensee's benefit.  Any recovery received pursuant

13450364.11

to such suit shall be retained by Licensee.  Licensor consents to be a party and to cooperate with Licensee in any such suit brought by Licensee pursuant to this section.

6.     **Patent Prosecution and Derivative Works**.

6.1     Licensor shall file, prosecute, and maintain all of the patents and patent applications included in the IP Rights, and shall not abandon the prosecution of any patent or patent application or discontinue the maintenance of any patent or patent application; provided however, that Licensor shall be permitted to abandon the prosecution or discontinue the maintenance of any such patent or patent application upon sixty (60) days written notice to Licensee.  In such event, at the request of the Licensee, Licensor shall assign such patents or patent applications, or any portion thereof, to Licensee, with all costs of such assignment to be borne by Licensee.

6.2     Derivative Works made or developed by Licensee shall be the exclusive property of Licensee.  Derivative Works made or developed by Licensor shall be the exclusive property of Licensor.

7.     **Assignment**. Licensor may not assign its rights and obligations under this Agreement without the written consent of the Licensee, such consent not to be unreasonably withheld. As a condition to such assignment, any successor or acquirer must expressly agree to be bound by the terms hereof.  Licensee may assign its rights and obligations under this Agreement.  Licensor and Licensee acknowledge and agree that immediately following the execution of this Agreement, all of Licensee's right, title and interest in and to this Agreement shall be assigned by Licensee to the buyer of the assets of the Licensee subject to the Bankruptcy Case.

8.     **Severability**. The parties agree that if any part, term, or provision of this Agreement is found illegal or in conflict with any valid controlling law, the validity of the remaining provisions shall not be affected thereby.

9.     **Publicity**. In publicizing anything made, used, or sold under this Agreement, neither party shall use the name of the other party or otherwise refer to any organization related to such party, except with the written approval of such party.

10.     **Waiver, Integration, Amendment**.

10.1     The waiver of a breach hereunder may be effected only by a writing signed by the waiving party and shall not constitute a waiver of any other breach.

10.2     This Agreement represents the entire understanding between the parties, and supersedes all other agreements, express or implied, between the parties concerning the subject matter hereof.

10.3     This Agreement may be amended only by a writing signed by both parties.

- 3 -

13450364.11

11.   **Cooperation**. Each party shall execute any instruments reasonably believed by the other party to be necessary to implement the provisions of this Agreement.

12.   **Bankruptcy Rights.** The rights and licenses granted to Licensee in this Agreement are licenses to "intellectual property" rights, as defined in Section 365(n) of the United States Bankruptcy Code (11 U.S.C. Section 101, et seq.). If Licensor is subject to any proceeding under the United States Bankruptcy Code (other than the existing Case), and Licensor as debtor in possession or its trustee in bankruptcy elects to reject this Agreement, Licensee may, pursuant to 11 U.S.C. Section 365(n)(1) and (2), retain any and all of the rights granted to it under this Agreement to the maximum extent permitted by law.  This Section 12 will not be construed to limit or restrict any right or remedy not set forth in this Section 12, including without limitation the right to retain any license or authority this Agreement grants pursuant to any provision hereof.

13.   **Governing Law and Forum**. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (without regard to its conflict of laws provisions). The parties hereby submit to the exclusive jurisdiction of the courts located in the Commonwealth of Massachusetts, both federal and state, and agree that any legal proceeding arising out of this Agreement shall be conducted solely in such courts.

14.   **Disputes**. Notwithstanding the foregoing, any unresolved dispute or difference between the parties arising out of or in connection with this Agreement shall be referred for review by the parties respective senior officers prior to either party taking any other action with respect thereto. The senior officers shall have thirty (30) days, or such lesser or longer period as the parties may agree, to try to resolve the dispute or difference.

15.   **Exportation of Technical Information**. Licensee agrees to comply with the laws and rules of the U.S. government regarding prohibition of exportation of any technical information included in the DEEP Assets.

16.   **Notices**. All notices, requests, demands and other communications under this Agreement must be in writing and shall be deemed to have been duly given if delivered by hand, mailed by registered mail, return receipt requested, postage prepaid, or by express mail and addressed as follows:

>   (i) if to Licensor:

>>   Déclion Pharmaceuticals, Inc. and Déclion SAS
>>   3 Ashland Road
>>   Boxford, MA 01921
>>   Attn.: Thomas Mathers

>   with a copy to:   _____
>>   _____
>>   _____

and

(ii) if to Licensee:    (to the address first set forth above)

with a copy to:    Donald F. Farrell, Jr., Esq.
    Anderson Aquino LLP
    240 Lewis Wharf
    Boston, MA 02110

or any other addresses of which either party shall notify the other party in writing as provided in this Section.

17.   **No Agency.**  Nothing contained in this Agreement shall be construed as creating a joint venture, partnership, agency, fiduciary or employment relationship between the parties.

18.   **Confidentiality.**  Licensor and Licensee shall use best efforts to maintain in confidence and not to disclose to any third party and confidential information received from the other party pursuant to this Agreement, unless (i) required by any statute, law, rule, regulation or order of any governmental agency or authority or a court of competent jurisdiction, or (ii) the information was known prior to its disclosure pursuant hereto or was disclosed by a third party who has a right to make such disclosure.

19.   **Termination.**  Licensee has the right to terminate this Agreement at any time.  If so terminated, the duty to maintain confidentiality shall survive such termination.

20.   **Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13450364.11

IN WITNESS WHEREOF the parties have caused this Agreement to be executed by their duly authorized officers as of the Effective Date.

LICENSOR:

Déclion Pharmaceuticals, Inc.                    Déclion SAS

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

LICENSEE

_____
John Aquino, not individually but solely
as Chapter 7 Trustee for Peptimmune, Inc.

13450364.11

**SCHEDULE A**

## DEEP Assets

U.S. and International patent applications and patents owned or controlled by Declion Pharmaceuticals, Inc. as listed herein, including those patent applications and patents as listed herein assigned by Peptimmune, Inc. to Declion Pharmaceuticals, Inc. in the assignment executed September 22, 2010 and recorded at the U.S. Patent and Trademark Office at Reel/Frame 025079/0357 and applications listed herein that were filed subsequent to that date, as well as divisional, continuation and foreign counterparts of any such patent applications or patents, all patents issuing from any of the foregoing, and all reissues, reexaminations and extensions thereof.

| Serial No. | Country |
|---|---|
| 60/792,085 | US (Provisional) |
| 11/787,229 | US (Utility) |
| PCT/US2007/009149 | PCT |
| 2007238595 | AU |
| 2,649,296 | CA |
| 07755426.9 | EP |
| 91066359 | HK |
| 2009505502 | JP |
| 60/928,255 | US (Provisional) |
| 60/999,283 | US (Provisional) |
| PCT/US2008/005919 | PCT |
| 12/151,762 | US (Utility) |
| 12/451,323 | US (Utility) |
| 2008287530 | AU |
| PI0811293-2 | BR |

13450364.11

| | |
|---|---|
| 2,686,817 | CA |
| 88273206 | EP |
| 101083015 | HK |
| 201997 | IL |
| 7251DELNP2009 | IN |
| 581190 | NZ |
| 10-2009-7025559 | KR |
| MX/a/2009/012085 | MX |
| 2010-507464 | JP |
| 200880023441.6 | CN |
| 2009/08142 | ZA |
| 60/999,284 | US (Provisional) |
| 61/124,689 | US (Provisional) |
| 61/196,473 | US (Provisional) |
| PCT/US2008/011871 | PCT |
| APP2010005261 | ARIPO |
| 2008311897 | AU |
| PI0817682-5 | BR |
| 2,709,679 | CA |
| 88395009 | EP |
| 205171 | IL |
| 3428DELNP2010 | IN |
| 1020107010797 | KR |
| 585367 | NZ |

13450364.11

| | |
|---|---|
| 1201000143 | OA |
| 2010027035 | SG |
| 201003480 | ZA |
| 61/168,555 | US (Provisional) |
| 12/386,493 | US (Utility) |
| PCT/US2009/002426 | PCT |
| 97326896 | EP |
| 589302 | NZ |
| 61/386,909 | US (Provisional) |
| PCT/US2010/057108 | PCT |
| 61/216,252 | US (Provisional) |
| 61/216,301 | US (Provisional) |
| 61/283,510 | US (Provisional) |

13450364.11